## TONG ET AL., TRUSTEES, v. ORR.

[No. 6,305.    Filed February 16, 1909.    Rehearing denied May 14, 1909.    Transfer denied December 8, 1909.]

1. TRIAL.— *Interrogatories.*— *Contracts.*— *Attorney and Client.*—A general verdict for plaintiff in an action on the *quantum meruit* for services rendered as an attorney, is not controlled by answers to interrogatories which fail to show that the contract found therein embraced the particular service sued for.    p. 682.

2. ATTORNEY AND CLIENT.—*Contracts.*—*Abandonment of.*—*Quantum Meruit.*—*Evidence.*—Where there is evidence tending to show that a client employed an attorney to prosecute a suit to quiet title, the representation being that the defense would be merely formal, and upon a hearing the defendant made a real defense involving seriously contested litigation, the client instructing the attorney to proceed with the case and "fight it to a finish," and the client paid to the attorney, on account, more than the contract price, a verdict for a still larger sum is supported, the evidence justifying an inference of an abandonment of the contract. Rabb, J., dissenting.    pp. 682, 685, 693.

3. ATTORNEY AND CLIENT.—*Contracts.*—An attorney, like other persons, is bound by his contracts.    p. 685.

4. TRIAL.—*Question for Jury.*—*Contracts.*—Whether a client contracted with an attorney for the prosecution of a merely formal suit, or for a contested litigation, is a question of fact for the jury.    p. 687.

5. CONTRACTS.—*Abrogation.*—*Formalities.*—No formality is necessary for the abrogation of an ordinary verbal contract.    p. 694.

From St. Joseph Circuit Court; *Walter A. Funk,* Judge.

Action by Joseph G. Orr, against Lucius G. Tong and another, as trustees.    From a judgment for plaintiff, defendants appeal.    *Affirmed.*

*Anderson, Parker & Crabill,* for appellants.

*Henry R. Wair* and *Joseph G. Orr, in pro. per.,* for appellee.

ROBY, J.—Action by appellee to recover the reasonable value of services as an attorney at law.    The case was tried by a jury, and a verdict and judgment had, in favor of appellee,

for $1,100.   Appellants moved for judgment on the answers to interrogatories and for a new trial, reserved exceptions to the adverse rulings on both motions, and, by assignments, bring the questions thus saved to this court for review.

The rules with regard to the effect of interrogatories as against a general verdict are well known.   Those under consideration fail to show that the contract therein found embraced the particular service sued for.   The motion for judgment was therefore correctly overruled upon this ground, as it was upon other grounds which will be stated later in connection with the ruling on the motion for a new trial.

Appellants are the trustees of the Alexis Coquillard estate. Coquillard, in 1888, conveyed certain real estate to the city of South Bend for park purposes.   The gift was not accepted by the city.   In 1892 appellants took possession of the land, fenced it, put in crops and have held possession ever since.   Shortly after Coquillard's death, which occurred in 1890, appellants began an effort to recover these lands, on the ground that the city had failed to comply with the condition of the gift.   Appellants had counseled with appellee relative to the matter a number of times prior to the employment out of which this controversy arises.   He had appeared before the board of public works for them, for the purpose of procuring a release from the city of its apparent title, and was entirely familiar with the facts connected with the matter.   In 1901 he made a proposition to the board of public works in behalf of appellants, to give thirteen lots on the river bank for boulevard purposes, and also a sum of money as a consideration for the city to quit claim to them the land in question.   In November, 1903, a newspaper reporter made inquiries of the board of public works relative to the prospects for the construction of the boulevard.   The president of the board, Mr. McInerny, went to appellee's office and said: ''I have come down to talk

to you about the boulevard. * * * I propose now to take up the question of the North Side boulevard in earnest.'' He further said: ''I have come for the purpose of seeing what arrangements I can make with the Coquillard estate for the purpose of getting these lots for the boulevard.'' Appellee told him that it was not worth while to bother appellants about any donation for the boulevard ''as long as the city holds on to the Coquillard park property, and will not let go of it.'' He then restated the proposition theretofore made to the board by appellee for appellants, to which McInerny replied, that he was perfectly willing to have it done, that it ought to be done, and said: ''I would suggest this, that inasmuch as in any event it would be necessary to have a suit to quiet title in order to remove the cloud, that the trustees institute their suit to quiet the title to this park property, and the board will submit the matter to the court. We will not make any particular defense, submit the deed, let him quiet the title to the land, and then let the trustees of the Coquillard estate make us a deed of the river lots for our boulevard.'' Appellee answered that that would probably be all right. Mr. McInerny then said: ''I wish you would see Mr. Perley [one of appellants], and see if some arrangement of that sort cannot be made.'' Appellee went to Perley, as requested, and repeated the statements made by McInerny, and said that he thought it ''a good chance to settle the matter.'' Appellant Perley said: ''What would you charge, or what would it be worth for your services for a suit of that sort?'' The amount fixed was $150, and said appellant replied: ''Well, that is reasonable enough. Go ahead and bring suit.''

Appellee thereupon prepared and filed a complaint to quiet title to the eighty-one acres of land which Alexis Coquillard in his lifetime attempted to donate to the city. This land was at the time of the trial worth $500 an acre, and subdivided it was worth from $1,500 to $2,000 an acre. A sum-

mons was issued and the cause set for trial three separate times, and on June 7, 1904, the city filed a cross-complaint, asking that the title to said lands be quieted in it. Prior thereto appellee had a conversation with Perley, in which he said, it was evident "that the suggestion of Mr. McInerny, that we have the matter disposed of in a friendly way, has failed to materialize, or has gone glimmering, and that we have a fight on our hands." The reply made by Perley was: "Yes, they are trying to hold me up for a good deal more land than I agreed to give, or am willing to give. Go ahead with the suit, and fight it to a finish." Subsequently the cause was tried, the trial occupying parts of two days. A decree quieting appellants' title to the land was made. The city obtained a new trial as of right on the same day, additional counsel was employed, and the case retried in April, 1905, such trial occupying four days, and being a very vigorously contested one. While this cause was pending appellee was paid on account of services $303.39, about which he testified as follows: "But I think that includes $10 given to me by Perley for expenses to Chicago in taking the deposition, really leaving on account of fees $293.39." Appellant Perley testified that the appellee made the following proposition: "Well, he says, 'Sam, this will be quite a prominent suit and I would like to take it before Judge Funk,' and, he says, 'if you will let me, I will do it for $150, and if we do not quiet the title it will only cost you the expenses.' * * * Well, I hesitated, and did not want him to do it, but I turned around to him and said, 'all right Joe, go ahead.' " His version of the payments subsequently made is as follows: "I had no idea they would do that [go to the Supreme Court], but at the same time I figured that you [appellee] would have some extra work, that you were a gentleman and I was, and you had agreed to do it for $150, and that there would be some extra work—that is where the lawyers get even with you—and you ought to get for that $200 or $300 extra. I thought you would get that out of me. Q. For

extras? A. Yes. Q. Notwithstanding the iron-clad agreement for $150? A. No, sir. That is just my honest conviction; and that you needed your money, and you ought to have a little something as you went along; and that $200 or $300 would be what you earned out of the proposition. You had done it for $150, and I would be perfectly safe in advancing you a little, as I have done in every case."

The jury in answer to interrogatories found that the $300 was paid on account. At this stage of the case the appellee is entitled to the presumption that all points were found in his favor so far as there is evidence in the record to sustain such findings. The character of appellee's testimony, when contrasted with that of appellant Perley, part of which only has been set out, leaves no room for a different conclusion. It affirmatively appears that appellee had no other claim against appellants at the time these payments were made except that arising out of this transaction. On cross-examination he was asked if he had not done work during that time for an interurban railway company in which Perley was an officer, and he testified that he had appeared in a highway matter which was still pending, and that he had brought an ouster suit for Perley before a justice, after the park litigation was practically over, but there is no evidence that any part of said payment was made on account of these matters.

The legal propositions involved in the appeal are entirely well settled. An attorney is bound by his contracts exactly as any other person. *Cordes* v. *Bailey* (1906), 39 Ind. App. 83; *Lavenson* v. *Wise* (1901), 131 Cal. 369, 63 Pac. 622. Had appellants' title been quieted in accordance with the proposition made by McInerny the amount of appellee's compensation would have been $150 as agreed upon by them. When appellee discovered that such disposition of the matter could not be made, he so notified his client, who, had he been as reluctant to engage in litigation as his testimony indicates, could have terminated the employment, and have gone out of court with-

out the sacrifice of any right. Instead of so doing he uses
language which indicates that the failure of such friendly
suit to materialize was due to his own refusal to carry out
what the city was demanding from him, and his instruction
to "go ahead with the suit and fight it to the finish," en-
tirely justifies the jury in finding that appellee's services in
the litigated suit were rendered upon appellants' request, and
the implied undertaking to pay the reasonable value thereof.
The subject-matter of the original contract had ceased to
exist. The rule that an attorney cannot make use of the re-
lation between himself and his client to extort from the lat-
ter an unjust and unreasonable contract for compensation is
unquestioned, but there is no suggestion in this case that any
advantage was taken of the client, that any misrepresenta-
tion was made to him, or that he was unfairly treated. Upon
the contrary, every fact was stated, and the conclusions
reached were the conclusions of the client, and it will not be
held by indirection or otherwise that the existence of the rela-
tion furnishes warrant for the client to take an unfair ad-
vantage of the attorney. That the original contract was
abandoned was not only properly inferred by the jury from
what was said by the parties, but the action of appellants
in making payments in excess of $150 operates as an admis-
sion against their interest, and justified the finding that the
reasonable value of the services rendered was what they were
undertaking to pay. *Frazier* v. *Myers* (1892), 132 Ind. 71.
It will, of course, not do to say that having originally con-
tracted with reference to a suit to quiet title, and having
prosecuted a suit to quiet title, that therefore there has been
no change of subject-matter. There is as much difference
between the suit contemplated by the original agreement and
the suit in fact conducted as there is between the construc-
tion of a smokehouse and a schoolhouse. If appellants' as-
sumption in this case were entertained, it would logically fol-
low that the same doctrine applies to building contracts, and
thus applied it becomes too absurd to discuss.

Whether the agreement as to fees had reference to the litigation which was in fact waged, or whether it had reference only to the formal suit contemplated by the McInerny proposition, was a question of fact, and it would be difficult to find evidence in this record upon which to sustain a verdict for appellants, had the jury found for them, as it did not do.

Judgment affirmed.

Comstock, P. J., Watson, C. J., and Myers, J., concur. Hadley, J., files concurring opinion. Rabb, J., files dissenting opinion.

## Concurring Opinion.

Hadley, J.—I am in full accord with the expressions and principles laid down in the dissenting opinion of Rabb, J., in this case, with reference to the duties and obligations of an attorney to his client, and of the absolute good faith that must be exercised in such relation; but I concur in the opinion and decision of the court as here expressed, for the reason that it is clear from the record as exhibited by the foregoing opinion that appellants understood and believed that the original contract was annulled, and that the prosecution of the suit, after it ceased to be a friendly or formal matter, was under a new contract. This is the interpretation placed upon the relation of the parties by appellants, and, under the circumstances of their position and condition, they should be held bound by such interpretation. As was said in the case of *City of Chicago* v. *Sheldon* (1869), 9 Wall. 50, 19 L. Ed. 594: "In cases where the language used by the parties to the contract is indefinite or ambiguous, and, hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence." *Vinton* v. *Baldwin* (1884), 95 Ind. 433; *Smith* v. *Board, etc.* (1893), 6 Ind. App. 153; *Board, etc.,* v. *Gibson* (1902), 158 Ind. 471; *Diamond Plate Glass Co.* v. *Tennell* (1899), 22 Ind. App. 132.

## DISSENTING OPINION.

RABB, P. J.—I am unable to concur with the opinion of the majority of the court in this case, for the following reasons:

One of the reasons of appellants' motion for a new trial is that the evidence is insufficient to sustain the verdict. Looking to the evidence, there is no dispute between the parties but that the services rendered by appellee, for which he seeks a recovery in this action, were professional services rendered by him as the attorney for the appellants in a suit waged by them against the city of South Bend to quiet title in the trustees to these lands conveyed, in the year 1888, by the decedent, Coquillard, to the city for park purposes. It is not disputed by appellee, and it is the theory of his case, that he was employed by the trustees in November, 1903, to institute this suit to quiet title, that at the time of his employment a special contract was made between himself and the trustees, by which he was to be paid for his services in such suit the sum of $150, and that under this agreement the suit was begun by him. But it is his contention that, at the time the contract of employment was made and the suit begun, it was the mutual understanding of himself and the appellants that the suit would be a friendly one, and that a vigorous defense would not be made by the city, but that the city, contrary to the expectation of the parties, appeared in the case and made a vigorous defense, requiring the expenditure on his part of more time and energy in the prosecution of the case than the contract of employment contemplated.

The character of the suit was in nowise changed. The suit that the appellee contracted to institute and conduct for the appellants, and which he did institute under his agreement, and did conduct, was one to quiet the appellants' title to the lands in question against the city. All the services rendered by appellee, for which he seeks a recovery in this action, were in the prosecution of that particular suit and

none other. It appears from the evidence that the suit was instituted at the suggestion of the appellee, and that all appellants knew regarding the character of the defense that the city would make was what appellee told them. It is not pretended that appellants made any representations to the appellee, regarding the nature of the defense that would be made by the city, and the character of litigation that would ensue upon the bringing of the suit, to influence him in fixing the amount of his compensation. The matter of attorneys' fees, in conducting litigations for their clients, is one of great importance, both to the attorney and the client, and one about which their views are very apt to differ widely. The value of the professional services of attorneys is not like the value of marketable commodities, such as wheat and corn; any one may tell what they are worth by a glance at the daily market reports. The attorney's services have no fixed and certain value that clients or any one else can reckon upon. If the value of such services is not fixed by contract, it must be determined by the testimony of members of the legal profession, and there are no well-defined rules by which even they can accurately tell what such services are worth. This is well illustrated by the evidence in this case, where, in the opinion of reputable attorneys, the value of the appellee's services in the suit to quiet title varied from $475 to $4,000.

Under such conditions, where the matter of an attorney's fee, as between attorney and client, is left to be determined by the value of such services as shall be measured by the attorney's professional brethren, it is quite natural that the client should feel himself more or less at a disadvantage. This disadvantage can only be obviated by contracting in advance what shall be charged for the particular service rendered. And where a client has taken the precaution to relieve himself from this embarrassment by contracting with his lawyer as to what his fee shall be for conducting the suit he proposes to bring or defend, thereby rendering fixed and

certain that part of the expense of litigation, which would otherwise be uncertain and beyond his power to approximate, and which he would naturally, as a prudent business man, consider with grave apprehension before entering upon the litigation, his contract with his attorney is not to be lightly cast aside, and the attorney permitted to ignore it after the services are rendered, and have his compensation measured, not by his open contract made with his client when they are at arm's length, but by what his professional brethren may consider the services worth after they have been performed. Attorneys at law are officers of the court, as much so as the judge on the bench. "They are ministers of the law." The relation of attorney and client, having once been established, the attorney is morally and legally bound to exercise the utmost good faith in his dealings with his client; and if, at the inception of his employment, he has, by contract with his client, fixed the amount of compensation in the particular case or service he is entering, if circumstances subsequently arise in the progress of the case that makes it apparent to the attorney that the compensation thus contracted for is not adequate, or that he will be required to render services for his client in the prosecution or defense of the case which he does not think covered by the contract, it is his duty promptly to inform his client of that fact, so that he may have an opportunity to make a new contract in reference to the attorney's fee, or if this cannot be done, exercise his judgment with reference to proceeding with the case, with the matter of attorney's fees undetermined. And the attorney failing to do this, and proceeding without saying a word to his client with reference to compensation for his services, will be bound by the contract of employment.

I think the case of *Lavenson* v. *Wise* (1901), 131 Cal. 369, 63 Pac. 622, correctly decides the law as applied to the question here involved, and is directly in point. In that case Wise held a note on certain parties for $9,760. He contracted with an attorney to collect the same by suit, agreeing

to pay to the attorney for his services $50 in cash, and $500 out of the proceeds of the collection. By his statements and representations to the attorney at the time of the employment he led him to believe that the case would not be litigated, but after suit was brought the defendant appeared and filed affirmative answers, setting up valid defenses, and prolonged and seriously-contested litigation followed, resulting in a judgment against the plaintiff. The services of the attorney in litigating the case were of the value of $1,000, and after its determination he sued his client on the *quantum meruit* for the value of such services. The attorney discovered at once on the filing of the defendant's answer in that case that the case would be litigated, and the nature of the litigation, but nothing was said by him to his client regarding the compensation for his services, or that he would demand any other or different compensation than was originally contracted for. It was held in that case that the attorney could not recover on the *quantum meruit* for the services thus rendered, and it was said by the court in deciding the case: ''Mr. Rothschild did nothing and said nothing which would lead Mr. Wise to suppose that any change was to be made in the contract of employment. * * * In the conversation which preceded the signing of the receipt there was nothing said about paying any fee in the event the suit was litigated; it was assumed by both parties that it would not be litigated. * * * He [Rothschild] could not proceed with the case as though the contract was still in force, with a mental reservation that he would repudiate it or rescind it after the trial should his client be cast in the suit. * * * Even though Wise gave him every assurance that he could overcome this defense, it did not change the fact that the contract of employment still bound Rothschild, and continued to do so until modified, superseded by another, or rescinded.'' The case cited and the case at bar are exactly parallel, in that in each case there was an express contract before the suit was brought, and at the time the attorney was employed,

to pay a fixed sum as compensation for services rendered in the particular suit; that an active defense was not anticipated; that nothing was said about paying any different sum in the event that active litigation followed; that in each case the defense disappointed the expectation of attorney and client, and made more vigorous defenses than was expected of him. In the case cited the defendant was not expected to litigate the case at all. In this case the attorney was expected to litigate it only in a "friendly" way, and the case is stronger for the client than the case cited, in that here the client made no representation whatever as to the nature of the defense that would be made; while in the case cited the attorney at the time he entered into the contract was induced by the representations of the client to believe that the case would not be litigated. Numerous cases are cited by counsel for appellee as supporting his contention that the services charged for in this action are not services that come within the purview of the contract entered into between the client and attorney at the inception of the suit, and at the time his employment was made. I have made a careful examination of all of them, and I do not think they apply to the case.

The case of *Bartholomew* v. *Langsdale* (1871), 35 Ind. 278, cited with apparent confidence by appellee as sustaining his view, is not, in my judgment, at all in point. In that case the attorney was employed simply to take down the evidence so that it might be copied into a bill of exceptions. The services he sued for were of an entirely different character—the preparation of the case for the Supreme Court. The case of *Singer, Nimick & Co.* v. *Steele* (1888), 125 Ill. 426, 17 N. E. 751, presents a very different question from the one here involved. In that case an attorney was employed at a fixed fee to obtain the settlement of a large claim, which he did, and in the settlement took an assignment of a large number of collateral claims. After the settlement had been so effected, it became necessary to render services in the collec-

tion of these collateral claims, and it was held that such services were not covered by the original contract. The case of *Sanders* v. *Seelye* (1889), 128 Ill. 631, 21 N. E. 601, was a contract between an attorney and client for a fixed fee for the services of the attorney in conducting a case through the Appellate Court. It was held that this contract did not cover services rendered in afterwards conducting the same case through the Supreme Court. I think all the other cases which have been cited belong in the same class, and that there is a wide distinction between them and the case at bar, where all the services were rendered in the one case, in the one court, and under the employment originally made.

It is further contended that the appellants, by their own construction of the contract, are estopped from asserting that the appellee is not entitled to recover on the *quantum meruit*, for the alleged reason that they paid to the appellee for his services more than the contract called for, and by so doing they placed a construction upon the contract adverse to what they are now contending for. I think the evidence does not justify this claim. It is true that it does show that $300, or about that sum, was paid by appellants to appellee, but it is not shown that it was paid on account of services rendered in this case, but that the appellee was employed in numerous other matters, and the payments were not specifically made upon any claim.

I think the evidence is wholly insufficient to sustain the verdict of the jury, and that appellants' motion for a new trial should have been sustained.


## ON PETITION FOR REHEARING.

ROBY, J.—The case of *Cordes* v. *Bailey* (1906), 39 Ind. App. 83, is not in conflict with the decision herein. It was held in that case that the parties were bound by their contract. It was not held that parties competent to make a contract might not, at their pleasure, cancel,

abandon, modify or change it.   It is not necessary to decide whether there is evidence in the record sufficient to sustain a finding that the original contract had not been abandoned. The sole question is whether there is evidence to sustain the finding made by the general verdict, and that being the case, an affirmance follows.

There is no special formula or set of words which must be used in abrogating or modifying a contract.   The question is one of fact, to be determined in the trial court upon the evidence in each case.

The petition for rehearing is overruled.