JESSIE M. HOUSE, EXECUTRIX OF THE ESTATE OF WILSON M. HOUSE, JESSIE M. HOUSE, JOHN M. HOUSE, SUE ANN SALMON, NANCY JANE RUBEY *v.* DOLORES LESOW, EXECUTRIX OF THE ESTATE OF JOHN E. LESOW AND JAMES E. LESH.

[No. 1-675A105. Filed December 30, 1975.]

450

*Eric A. Frey, Rosenfeld, Wolfe, Frey & Lowery,* of Terre Haute, for appellants.

*Steven H. Ancel, Ancel and Ancel,* of Indianapolis, *Kenneth C. Miller, Miller & Miller,* of Brazil, for appellees.

LOWDERMILK, J.—Plaintiffs-appellees Lesow and Lesh (hereafter, Lesow) brought an action to recover the commission allegedly due to them for services rendered in procuring the sale of all of the stock of Eastern Express, Inc., then owned by defendants-appellants Wilson House and other members of the House family (hereafter, House).

Lesow had represented the House family for many years in the family's dealings with the Interstate Commerce Commission. House became interested in the possible sale of the family's entire interest in Eastern Express, and Lesow subsequently introduced House to a third party who purportedly was one of a group of investors interested in purchasing Eastern Express stock. At that time, an agreement was entered into between the House family and Lesow. It provided that a fee of 4% of the "purchase price" of the stock would be paid to Lesow in return for his services both in procuring the sale of the stock and in performing the legal services necessary to consummate such a transaction, including the

obtaining of Interstate Commerce Commission approval of the sale. The contract was entered into by both parties in an arms-length transaction. It is this contract, set out more fully below, that we are called upon to construe.

After the contract was agreed to by both parties, it developed that the group of investors that had expressed interest in a possible purchase of the stock were only agents for American Export Industries, Inc. (A.E.I.), an east coast concern interested in purchasing a trucking operation. Although House was surprised by this turn of events, a sale was eventually arranged between A.E.I. and the House family for a consideration of ten million dollars, the bulk of which was to be paid over a five year period in equal annual installments. It appears that this sale was still within the terms of the commission contract and this fact is not in issue in this appeal.

During the negotiations, the A.E.I. representatives informed the House family that Eastern Express stock could not be used as collateral, to guarantee payment, and that the House family would have to accept unsecured notes subordinated to senior indebtedness in order to complete the transaction. Inasmuch as this arrangement was not initially acceptable to the House family, a special provision was included in the sale-purchase agreement.

It stated that A.E.I. would arrange to have an irrevocable letter of credit issued to House that would be payable only in the event that default occurred on the third or fourth payments due under the sales agreement. House paid the cost incurred by A.E.I. in obtaining the issuance of the letter of credit.

The sale was consummated, three payments were made on schedule, but A.E.I. defaulted on the fourth payment. House had its local bank begin collection proceedings on the letter of credit that had been issued by a New York bank, and shortly thereafter the local bank received payment on the letter of credit.

The commission contract provided as follows:

"Compensation shall be payable to you only as and when the stockholders receive payment of the purchase price, either in cash or in other property, on one or more occasions, and in an amount equal to four per cent (4%) of the purchase price amount received on any particular occasion."

Under this clause, Lesow had received the commission payments due to him for all payments that had been collected by House, up to and including the third payment. When House discovered that the fourth payment on the sales contract would not be forthcoming, and that collection under the terms of the letter of credit would be necessary, he informed Lesow that no further commission payment would be made, regardless of whether the letter of credit was collected.

Lesow immediately instituted suit against House for the amount of the commission due. At the same time, he initiated attachment and garnishment proceedings against the local bank for a four per cent share of the proceeds of the letter of credit, which proceeds were then being held by the local bank for the benefit of House. The garnishment was granted but this action was later held improper, and the garnishment was released.

At this point, House filed a counterclaim seeking actual and punitive damages for Lesow's wrongful attachment and garnishment. The trial court granted partial summary judgment to Lesow on the issue of the commissions due to him, but reserved judgment on House's counterclaim. It eventually denied relief to House on the counterclaim, stating that the liability of House on the principle issue had foreclosed the possibility of House recovering on the counterclaim.

The two issues to be decided are (1) whether House is liable under the commission contract; and (2) whether the trial court's denial of recovery under the counterclaim for wrongful attachment and garnishment was proper.

## I.

The trial court granted Lesow's motion for summary judgment in regards to the commission contract. We must affirm that judgment if we find no genuine issue of material fact and find that Lesow is entitled to a judgment as a matter of law. Ind. Rules of Procedure, Trial Rule 56. No challenge is made to the court's finding of fact, but House does contend that the court incorrectly applied the law.

The cardinal principle of contract interpretation is to ascertain the intention of the parties from their expression of it and to give effect to that intention if it can be done consistently with legal principles. *Fort Wayne Bank Bldg., Inc.* v. *Bank Bldg. & Equip. Corp.* (1974), 160 Ind. App. 26, 309 N.E.2d 464.

Although evidence of intent of the parties which is extrinsic to a contract may properly be considered by a court where fraud, mistake, illegality, duress or undue influence are shown, such evidence is not admissible where these are not shown and where the terms of the instrument are susceptible of a clear and unambiguous construction. *Id.* If the meaning of a contract is clear and unambiguous on its face, its effect will not be controlled by an erroneous construction placed on the agreement by the parties. *Id.*

Contracts should neither be so narrowly or technically interpreted as to frustrate their obvious design nor be so loosely interpreted as to relieve the obligor from a liability fairly within the scope or spirit of their terms. *Pierce* v. *Yochum* (1975), Ind. App., 330 N.E.2d 102.

In construing a contract, the court cannot extract particular clauses, but must read the contract as a whole, giving effect to each provision if possible. *Myers* v. *Maris* (1975), 164 Ind. App. 34, 326 N.E.2d 577. In the absence of an ambiguity, the construction of a written contract

is a question of law to be resolved by the court. *Id.* The test used to determine if a written contract is ambiguous is whether reasonable men would find the contract subject to more than one construction. *Id.*

The commission contract provided, in relevant part, as follows:

"We have agreed to pay you compensation in consideration of your promises and services in effecting sale of the stockholders' stock in Eastern on terms acceptable to the stockholders. The purpose of this letter is to state our agreement and the amount of compensation to be paid to you, if any. The stockholders agree that, if the group referred to—or any member thereof—enters, within one year from the date of this letter, into a contract to purchase, or purchases, all the stock of the stockholders in Eastern on terms satisfactory to the stockholders, then, the stockholders agree to pay to you a sum equal to four per cent (4%) of the *purchase price to be paid* to the stockholders for their Eastern stock. *"Purchase price" means the consideration paid* to the stockholders expressly, and only, for their Eastern stock *by the buyer group involved* or member thereof, whether the consideration be payable in cash or the equivalent of cash, or in the stock or securities of any other person. "Person" means an individual, firm, corporation or other entity. "Purchase price" does not include consideration received by a stockholder or any other person from any person for any asset other than Eastern stock, nor does it include money or other property received from Eastern or from any subsidiary of Eastern, whether or not any such property becomes receivable to the stockholders in a transaction entered into in the process of effecting the sale of Eastern stock to the group in question. . . . (I)f in connection with the sale to such group or members thereof all or any part of the stockholders' Eastern stock Eastern redeems or purchases any portion of the stock of the stockholders by distributing to the stockholders or any other person any stock of any of the subsidiaries of Eastern or any property of such subsidiaries— such discharge of indebtedness or such distribution of property shall not be taken into account as "purchase price" in computing the compensation payable to you hereunder." (Our emphasis.)

House contends that the contract's definition of "purchase price" is clear and unambiguous, *i.e., consideration paid by the buyer group involved.* Since House collected the fourth payment owed by A.E.I. from the bank under the letter of credit arrangement, and not from A.E.I. itself, House contends that such collections do not fall within the definition of "purchase price," that no "purchase price" was received by him under the contract definition, and thus, that no commission payment is due.

We agree that the contract is clear and unambiguous, and thus the intention of the parties must be determined from within the "four corners" of the document. However, as we noted above, the language of the contract must be considered as a whole, and individual phrases and sentences cannot be taken out of context in order to arrive at a desired result.

We interpret the above language as follows. House agreed to pay four per cent commission to Lesow for Lesow's services in both procuring an agreement and completing the necessary legal work incident thereto. The four per cent commission was to be figured on the basis of the purchase price *to be paid,* not the price *actually* paid. The language clearly anticipates the possibility of a "contract to purchase" extending into the future. While the term "purchase price" is specifically and narrowly defined as only that consideration passing directly between the parties, the operative sentence of the contract clearly provides that the commission is to be figured on all such consideration that is *to be paid,* not just that consideration that is *actually* paid at some indefinite future date.

Our conclusion in this regard is strengthened by the closing provision in the contract as to the *time* of payment (see p. 3, *supra,* for the full quote). Compensation is *payable* only as it is received by House. Clearly, the amount of the payment was to be determined without regard to the time of payment,

and vice versa. Were this not so, there would be no reason to include two separate provisions in the contract. Thus, the amount of the commission is figured as four per cent of the "purchase price," but the time for payment of this commission is deferred until such time that House actually receives payment of the purchase price.

In *Lee* v. *Bossung* (1956), 127 Ind. App. 388, 138 N.E.2d 913, this court held in a similar situation that the broker had earned his commission by procuring a contract of sale that was suitable to both parties, and that the happening of a future event (there, as here, receipt of contract payments from the obligor) was fixed upon merely as a convenient time for the buyer to make payment of the commission due. We further held that if the future event does not happen, the law implies a promise to pay within a reasonable time. It thus appears that the question in the case at bar is whether the future event has, or will ever, happen, so that the commission that has been earned is now, or will ever become, presently due and payable.

In order to collect on the letter of credit it was necessary for House to surrender A.E.I.'s note so that the note could be marked "paid" at the time the letter of credit was paid. The collection of the letter of credit by House foreclosed any possibility that the note itself would be paid directly by A.E.I. Inasmuch as the future event that was fixed upon for payment could not happen, the law implies a promise that payment will be made within a reasonable time. We thus hold that the trial court's award of summary judgment was proper.

## II.

The only other issue to be decided is whether the trial court erred in denying recovery to House on the counterclaim for wrongful attachment and garnishment. As noted above, House contends that the trial court based the judgment on the fact that House did not prevail

on the main action. We agree with House that in this case the dismissal of the attachment proceedings, and not the main action, is the critical element that must be shown in order to maintain a malicious prosecution action. *See* Prosser, *Law of Torts,* § 120 at 853 (4th ed. 1971). We do not agree that that error alone mandates reversal.

An examination of the record has disclosed that the trial court made no special findings of fact or conclusions of law on the issue of the counterclaim, but did make such findings and conclusions on the main action pursuant to Lesow's request. There is no indication that House made a similar request. Thus, the court's entry of judgment against House on the counterclaim was general only. Further, it constitutes a negative judgment, inasmuch as House had the burden of establishing his cause of action, and it may be appealed only on the grounds that the judgment was contrary to law. *Borden Cabinet Corp.* v. *Town of Borden* (1974), 160 Ind. App. 399, 312 N.E.2d 138. A negative judgment will be reversed only when the evidence is without conflict and leads to but one conclusion, and the trial court has reached an opposite conclusion. *Id.*

The parties disagree as to whether the cause of action here alleged is one of malicious prosecution or an abuse of process. While we believe that sufficient facts have been alleged to make out a cause of action under either theory, it is clear that those facts are not uncontroverted, nor do they lead to but one conclusion as to either theory. That being the case, we are unable to say that House has shown a right to recovery as a matter of law, and thus, the judgment of the trial court as to the counterclaim must be affirmed.

## III.

Lesow has asked this court, pursuant to Ind. Rules of Procedure, Appellate Rule 15(F),[1] to assess damages against

---

1. Indiana Rules of Procedure, Appellate Rule 15(F) provides: "If the court on appeal affirms the judgment, damages may be assessed in

House not exceeding 10% of the judgment. We believe this case is controlled by *American Savings & Loan* v. *Hoosier State Bank* (1975), 167 Ind. App. 43, 337 N.E.2d 486 (handed down November 26, 1975), wherein the court said:

". . . An award of damages pursuant to AP. 15(F) is discretionary with this Court and as stated by the Supreme Court of Indiana, '. . . should not be issued without a strong showing of bad faith on the part of the (appellant) . . .' *Annee* v. *State* (1971), 256 Ind. 686, 274 N.E.2d 260 (on rehearing). Although we find that the evidence is not uncontradicted as claimed by American Savings, we do not believe this to be a proper case for the application of AP. 15(F). See *King* v. *Pollard* (1974), [160] Ind. App. [209], 311 N.E.2d 454; *Kourlias* v. *Hawkins* (1972), [153] Ind. App. [411] 287 N.E.2d 764."

We find no bad faith on the part of House, nor any indication that the appeal of this cause was frivolous in any way. There is no basis for the award of damages under AP. 15(F).

Judgment affirmed.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 339 N.E.2d 86.

favor of the appellee not exceeding ten per cent (10%) upon the judgment, in money judgments, and in other cases in the discretion of the court; and the court shall remand such cause for execution."