The RADIO PICTURE SHOW PART-
NERSHIP, Roxxon Entertainment Cor-
poration, General Partner and Other
Unknown Partners, Appellant,

v.

EXCLUSIVE INTERNATIONAL
PICTURES, INC., Appellee.

No. 1–684A141.

Court of Appeals of Indiana,
First District.

Sept. 24, 1985.

Rehearing Denied Oct. 25, 1985.

Dale P. Webster, Sturm & Smith, Vincennes, for appellant.

Jeffrey Kolb, Emison, Emison, Doolittle & Kolb, Vincennes, for appellee.

## STATEMENT OF THE CASE

NEAL, Judge.

Defendant-appellants, Radio Picture Show Partnership (Radio), Roxxon Entertainment Corporation (Roxxon), 3622 Limited, Encore Properties, Inc. (Encore), and WEMCO, Inc. (WEMCO), appeal an adverse judgment for breach of contract rendered by the Knox Superior Court, without

a jury, in favor of Exclusive International Pictures, Inc. (Exclusive).

We affirm.

### STATEMENT OF THE FACTS

A chronological statement of the facts most favorable to support the judgment is as follows: Pursuant to various forms of correspondence occurring between K.A. Green, president of Roxxon, and Eddie Stewart, vice president of Exclusive, including numerous phone calls, letters, and promotional materials, Green sought to employ Stewart's services for the distribution of a film entitled "The Radio Picture Show." Subsequently, Green drafted the contract in question on January 29, 1980, on stationery with a letterhead "Roxxon Program Sales" in California and mailed it to "Mr. Eddie Stewart, Exclusive International Pictures" in Vincennes, Indiana. Green signed the letter "Sincerely, ROXXON PROGRAM SALES, division of THE RADIO PICTURE SHOW PARTNERSHIP, ... K.A. Green, President of Its General Partner, ROXXON ENTERTAINMENT CORPORATION." It was executed "READ UNDERSTOOD AND AGREED: EIP, By Eddie Stewart, Pres. Date 2–4–80.-" Eddie Stewart returned an executed copy to Green. The body of the executed copy reads as follows:

"This letter will set forth our understanding of the relationship between you, as an independent producers sales representative, and Roxxon Program Sales, division of The Radio Picture Show Partnership, hereinafter referred to as the "Company".

1. You are hereby appointed as a representative for the sale of the Company's products for the following territory, more fully described by State name: DELAWARE; DIST OF COLUMBIA; ILLINOIS; INDIANA; IOWA; KENTUCKY; MICHIGAN; MINNESOTA; MISSOURI ...; NEW JERSEY; OHIO; PENNSYLVANIA; TENNESSEE; VIRGINIA; WEST VIRGINIA; WISCONSIN.

[Penned-in, N.Y. N.J. CONN. R.I. MASS. E.S.]

2. It is recognized and agreed that you are not an agent or employee of the Company for any purpose whatsoever, but have contracted to act as an independent representative, and that you will comply with the laws and regulations of the various jurisdictions in your territory in selling the Company's products.

3. You will devote such time, talent and effort as may be necessary to effectively promote and maximize the sale of the Company's product in your territory.

4. You will keep the Company advised of your activity with regards to sales and solicitation of sales and agree not to make any representations, guarantee or warranty with respect to the Company's product, except as is authorized by the Company in its policy, literature and sales material.

5. All exhibition license agreements are subject to the approval and acceptance by the Company at its main office.

6. For services rendered under this Agreement, the Company shall pay you Twenty-Five (25) **********% commission on its Net Sales within stated territory.

For purposes hereof, the term "Net Sales" shall mean the total gross sales less discounts, all allowances and credits granted.

7. Within 20-days after the end of each calendar month following shipment of the products, the Company shall render a report to you, showing the amount of commissions payable and basis on which it was determined. In addition, the report shall show collections due. Each such report shall be accompanied by the payment in full of any commissions due, on collected accounts, for such calendar month.

8. This Agreement may be altered or amended at any time by mutual agreement. This Agreement may be

terminated by either party by giving thirty (30) days written notice.

If you approve and accept the provisions of this Agreement, please acknowledge the enclosed copy and return it to me as soon as possible."

Before executing the agreement, Stewart, pursuant to prior consultation and agreement with Green, made the penned in changes in the contract and initialled them, adding to his territory New York, New Jersey, Connecticut, Rhode Island, Massachusetts, and striking out the limitations on Missouri.

Thereafter, Stewart contacted 100 to 120 television stations in his territory, including Indiana stations in Evansville, Fort Wayne, Terre Haute and Elkhart, attempting to sell the film for cash rental. Promotional materials were then sent directly from Radio to those stations solicited. Stewart received a positive response, but prospective buyers indicated a desire to wait until after the NAPTI Convention (a national convention where television programs are viewed, offered and sold). Upon recontact after the convention, Stewart was told by prospective buyers that the film was being offered in his territory on a barter basis by others. (A barter is apparently where a show is traded to a station for advertising time which the seller then markets if he can). Stewart complained to Green on March 25, 1980, and Green told him he had been replaced. However, no notice of termination of the agreement was given to Exclusive in writing pursuant to paragraph 8 until March 25, 1981, when such a notice was given by letter by the law firm of Kaplan, Livingston, Goodwin, Berkowitz and Selvin of Beverly Hills. The notice stated only that the contract had been cancelled on March 31, 1980, and if it wasn't, it was now cancelled pursuant to paragraph 8 of the contract. Litigation had been commenced August 14, 1980.

Radio had given one Raymond Horn an exclusive contract around May or June of 1980 to sell the film in the entire United States, and for his services, Horn received $19,190.00. Among other states in Exclusive's territory where Horn sold the film was Indiana, where it was sold and shown in Terre Haute, Fort Wayne and South Bend. Upon Green telling Stewart that Exclusive had been replaced, Stewart ceased further effort to sell.

Exclusive commenced its suit in Knox County, Indiana, on August 14, 1980, and named Radio, Roxxon and other unknown partners as defendants. Service by registered mail was attempted on Green, Roxxon's president and resident agent in California, who refused service. Alias service, pursuant to Ind. Rules of Procedure, Trial Rule 4.4(B)(2), was subsequently effected by the Secretary of State, and Green accepted that service on September 3, 1980. Radio appeared, filed its answer in (1) denial; (2) lack of jurisdiction; (3) insufficient service of process, and subsequently filed its motion for judgment on the pleading supported by an affidavit of John Brown. Therefore, pursuant to Ind. Rules of Procedure, Trial Rule 12(C), the motion became a motion for summary judgment. The affidavit, as well as other testimony at the trial, revealed that Radio was a California partnership whose general partner was Roxxon, a California corporation and whose president was K.A. Green. A Texas partnership, 3622 Limited, was a limited partner of Radio and John Brown was its president. 3622 Limited was itself a limited partnership, consisting of Encore, the general partner whose president was also John Brown, and WEMCO, a Texas corporation, the limited partner, whose president was Mark Hundall. An entity, Tuffy Corporation, of whom John Brown was president and sole owner, was formed for the sole purpose of succeeding Roxxon as general partner in Radio. The motion for judgment on the pleading was denied.

Exclusive then amended its complaint and named 3622 Limited, Encore and WEMCO as party defendants. Service of process by registered mail was effected on these parties, and John Brown signed the return receipt for 3622 Limited and Encore. Those new parties, 3622 Limited and Encore, filed answer in (1) denial; and (2) lack

of jurisdiction. John Brown denied that he was a stockholder, director or officer of Roxxon, the general partner in Radio, yet the record shows much activity on the part of John Brown in the affairs of the various companies and partnerships and in the enterprise involved here.

Sometime in April 1980, Brown, Hundall, Green and Horn attended a meeting in Raleigh, North Carolina where decisions were made concerning the sale of the show. Horn testified that he had further conversations with Green, Brown and Hundall about bartering the show. Horn stated, "[I] could find equally Kenny Green or Hundall or John Brown[, and I] spoke with all of them about the same amount of time." Brown acknowledged that he became involved in selling the advertising time bartered by Horn. He and others went to New York, contacted advertising firms and Brown also contacted advertising firms in Dallas. He conceded that he talked to Horn on numerous occasions, and received money Horn set him. Brown became involved as early as January 1980, but became specifically involved in May. He had the ultimate responsibility to see that the bartered time got sold.

The Tuffy Corporation was owned by Brown, and according to him, was created for the purpose of succeeding Roxxon. There is no explanation of why Roxxon was to be succeeded. He signed Radio's 1980 partnership income tax return which showed a huge loss which in turn was reflected in his other corporations. His only claimed connection to Radio was through Encore, 3622 Limited, and later, Tuffy. Extraordinarily, he claimed that he did not know what happened to Green or Roxxon, who allegedly withdrew July 1, but at other places in the record he recites that part of the information for the income tax return came from Green. He also stated, "There were certain problems with the partnership that Kenny Green had. Getting his resignation done." Relative to other expenses in the loss on the return he stated, "Mainly the most of that proportion of the costs represented our initial invest-

ment to Roxxon Entertainment when we bought in."

All the evidence covering the various entities, their ownership, their offices and their interconnection was by way of oral testimony by John Brown. No documents were ever presented in evidence to support those statements such as partnership agreements demonstrating the nature and extent of the limited partnership, officers, directors, and other pertinent information.

Additional facts will be shown under relevant issues.

## ISSUES

Appellants present the following issues on appeal:

I. Whether or not the trial court had jurisdiction over The Radio Picture Show Partnership.

II. Whether or not The Radio Picture Show Partnership was properly served with process.

III. Whether or not there was a valid contract between Radio Picture Show Partnership and Exclusive International Pictures.

IV. Assuming The Radio Picture Show Partnership and Exclusive International Pictures entered into a valid contract, was it abandoned?

V. Assuming The Radio Picture Show Partnership and Exclusive International Pictures entered into a valid contract, did the contract grant Exclusive International Pictures the exclusive right to sell The Radio Picture Show in certain states?

VI. Whether or not there was sufficient evidence presented at trial to justify the trial court's judgment against the 3622 Limited, the limited partner in The Radio Picture Show Partnership.

## STANDARD OF REVIEW

■ We first remind Radio of our standard of review. This court presumes the trial court correctly decided questions presented, and the appellant has the bur-

den of overcoming this presumption by demonstrating how the trial court committed serious error. *Dicus v. Ripley County Bank, Osgood, Indiana*, (1984) Ind. App., 471 N.E.2d 1257. Further, this court does not weigh the evidence or adjudge the credibility of witnesses, but rather we are limited to determining whether the decision is sustained by substantial evidence of probative value. *Hoosier Insurance Co. v. Mangino*, (1981) Ind.App., 419 N.E.2d 978. We will consider that evidence and the reasonable inferences to be drawn therefrom which support the decision. *Peterson v. Culver Educational Foundation*, (1980) Ind.App., 402 N.E.2d 448.

## DISCUSSION AND DECISION

Issue I: *Jurisdiction.*

Radio argues first that sufficient minimal contacts did not exist to subject defendants to the jurisdiction of Indiana courts. It claims that the only three contacts were (1) by telephone; (2) mailing of flyers and promotional material to Exclusive; (3) mailing letter of general information. Radio omits (4) a letter dated January 18, 1980, soliciting Exclusive in Indiana to be its sales representative; (5) negotiations with Exclusive by telephone; (6) the contract was signed by Exclusive in Indiana; (7) Exclusive, as Radio's sales representative, contacted television stations in Evansville, Terre Haute, and Elkhart; (8) Radio mailed promotional material and tapes to these stations upon Exclusive's request; and (9) Horn sold the show in Terre Haute, Fort Wayne and South Bend where it was shown, and from which Radio received barter commission.

■ Ind. Rules of Procedure, Trial Rule 4.4(A)(1) provides that any organization that is a non-resident of Indiana submits to the jurisdiction of the courts of this state as to any action arising from doing business in this state. In *Griese-Traylor Corp. v. Lemmons*, (1981) Ind.App., 424 N.E.2d 173, minimum contacts were established by the execution of a contract to buy and sell stock of a company also located in Indiana, where the seller was an Indiana

resident, and the buyer was a resident of Florida. In that case an exhaustive analysis was made that need not be repeated here where we concluded that due process had been met. In *Green v. Robertshaw-Fulton Controls Co.*, (S.D.Ind.1962) 204 F.Supp. 117, 137, it was held that Indiana had not adopted a narrow interpretation of the term "doing business," but has given it a liberal meaning and the language of the rule is as broad as constitutionally permissible. Purposeful activity in the state, both preliminary to and subsequent to the execution of the contract out of which the claim arose, is considered in determining minimal contact. *See also Woodmar Coin Center, Inc. v. Owen*, (1983) Ind.App., 447 N.E.2d 618; *Tietloff v. Lift-A-Loft Corp.*, (1982) Ind.App., 441 N.E.2d 986. *Woodmar* found minimum contacts by soliciting and forming a contract with an Indiana resident by two phone calls initiating the relationship and the parties' subsequent negotiations. *See also Cumis Insurance Society, Inc. v. South-Coast Bank*, (N.D.Ind. 1984) 587 F.Supp. 339.

We find that Indiana courts have jurisdiction.

Issue II. *Service of Process.*

Radio's entire argument on this issue consists of the following:

"The evidence at trial shows that Exclusive served process on Green as the agent of Radio on September 3, 1980. (Record p. 4).

Radio in its Motion for Judgment on the pleadings and affidavits which were made a part thereof clearly establish that on the date of service Roxxon Entertainment was no longer the general partner of Radio and the uncontroverted evidence at trial was that Roxxon and Green had been replaced sometime in July of 1980. (Record p. 130).

Therefore at the time Green received service of process he was not the President of the general partner of Radio and Radio was never properly served with process in accordance with Trial Rule 4.4."

■ Radio has waived any issue by its failure to present cogent argument or citation of authority. *State v. Edgman,* (1983) Ind.App., 447 N.E.2d 1091. *Brinson v. Sheriff's Merit Board of Jefferson County,* (1979) 182 Ind.App. 246, 395 N.E.2d 267.

■ In any event this issue is without merit.

Radio claims of Roxxon's withdrawal at some time is unsupported by documents. The factual situation here, though not as elaborate, is fundamentally the same as existed in *General Finance Corp. v. Skinner,* (1981) Ind.App., 426 N.E.2d 77, *on rehearing* 431 N.E.2d 526, *trans. denied* (1982). In *Skinner,* an elaborate corporate organization existed wherein General Finance Corporation was the parent of 25 other corporations having "General Finance" as their name, one of which was General Finance Corporation of Indiana. Plaintiff sued General Finance Corporation, an Illinois corporation, but served the resident agent of General Finance Corporation of Indiana. We held the service good, based primarily upon the interlocking nature of the corporate empire and control.

Ind. Rules of Procedure, Trial Rule 4.15(F) provides:

"No summons or the service thereof shall be set aside or be adjudged insufficient when either is reasonably calculated to inform the person to be served that an action has been instituted against him, the name of the court, and the time within which he is required to respond."

Ind. Rules of Procedure, Trial Rule 4.6(A)(1) requires service to be made upon the executive officers or lawfully appointed agent of the corporation. As seen here, Green, president and resident agent of the general partner Roxxon, was served and appearance was actually made. Therefore, T.R. 4.15(F) and T.R. 4.6(A)(1) have been met. Radio's sole argument rests on the proposition that because they, without notice to Exclusive, substituted another entity, other than the entity dealt with, into their complicated, closed and secret heirarchy of companies, they can defeat litigants trying to serve them.

The analysis of the cases in *Skinner* reflect that Indiana, as well as most courts, will not permit business enterprises to so structure themselves in a complex, incomprehensible manner with multiple entities so as to prevent ascertainment of which corporate entity should be served, or who should shoulder the responsibility to the injured party. Litigants can only rely on words and representations of known companies, officers and records. Here a complex structure seen through a glass darkly is formed and changed for no other purpose than to shield its participants from liability and mask the interest and identities. Exclusive had no way, absent discovery after suit was commenced, to know the structure of the enterprise or the alleged substitution. As we said in *Skinner:*

"The cases hold in effect that Skinner need not transverse this corporate labrinth in search of a defendant, but may serve that visable portion of the enterprise held out to her."

*Skinner, supra,* 431 N.E.2d at 527.

■ Further the trier was not required to believe that the business partner, Roxxon, and its president, Green, merely disappeared or even withdrew. In its ruling the trial court indicated it did not. Radio chose to conduct its business in Indiana from California in the manner described and cannot complain if persons relied on it. All principal officers of all entities were served —Green, Brown and Hundall. We note that 3622 Limited, Encore and WEMCO have presented no question. Misnomers are no defense if the proper person is indeed served. *Glennar Mercury-Lincoln, Inc. v. Riley,* (1975) 167 Ind.App. 144, 338 N.E.2d 670. The ubiquitous John Brown, who was served, seemed to control all aspects of the enterprise. We find no error.

Issue III. *Validity of the Contract.*

Radio argues under this hearing that the contract was invalid because Stewart altered the contract after Green signed it. Therefore, it contends there was no mirror image acceptance, and the amended con-

tract was merely a counteroffer which was never accepted. Radio omits the testimony that the alteration was done only after prior consultation with and approval by Green, and that Green received the altered contract and acted on it. Even as late as March 25, 1981, Radio's lawyer, by their letter, did not challenge the existence of the contract, nor does it seem to have been made an issue at trial.

▆▆▆ Radio relies on *Goethals v. De-Vos*, (1977) 174 Ind.App. 143, 366 N.E.2d 673; *Gerardot v. Emenhiser*, (1977) 173 Ind.App. 353, 363 N.E.2d 1072; and *Gates v. Petri*, (1957) 127 Ind.App. 670, 143 N.E.2d 293. Those cases essentially support the truism that in order for an offer and acceptance to constitute a contract, the acceptance must meet and correspond in every respect with the terms proposed. The rule is called the mirror image rule. However, an acceptance which varies the terms of the offer is considered as a rejection and operates as a counteroffer which may be accepted by the original offeror by performing under the terms contained in the counteroffer. *Uniroyal, Inc. v. Chambers Gasket & Manufacturing Co.*, (1978) 177 Ind.App. 508, 380 N.E.2d 571. Conduct can recognize the existence of a contract. *Uniroyal, supra.* A counteroffer, unless expressly stated, need not be in writing. Even a contract in writing, unless the Statute of Frauds is involved, can be amended by parol. The contract here even contemplated amendment by mutual agreement.

▆▆▆ We therefore hold that the pre-agreed upon modifications acted upon by the parties did not prevent the formation of a contract.

Issue IV. *Abandonment.*

▆▆▆ Radio claims the evidence discloses that Exclusive abandoned the contract. Again, it ignores relevant evidence. Exclusive ceased solicitation only after Green told Stewart he had been replaced. Even attorneys Kaplan, etc. did not claim abandonment, nor was there such an issue at trial. Radio cites only *Commercial Acceptance Company v. Walton*, (1931) 93 Ind.App. 136, 176 N.E. 244; *Tong v. Orr*, (1909) 44 Ind.App. 681, 87 N.E. 147, *denied on rehearing* 88 N.E. 308. These cases merely hold that a contract can be cancelled, abandoned or modified at the pleasure of both parties. We find no unilateral abandonment by Exclusive.

Issue V. *Exclusive Contract.*

Radio argues that the contract, if valid, did not grant Exclusive an exclusive right to sell the Radio Picture Show in the designated territory, as found by the trial court. Therefore, Radio concludes Exclusive has no right to any commissions because he failed to sell the show to any station. Relative to this issue, Stewart testified at the trial about the custom and usage in the trade.

"Motion pictures, except for those in public domain, are sold exclusively in different areas by different distributors. It's impossible to sell a picture with someone else selling your picture or bartering your pictures. You must control the rights for that designated area or you cannot get the best monies received. Example, Universal Pictures has a film called JAWS. It is theirs. It's exclusive. Every film that is new is handled exclusively. I know of no areas where you would have three or four distributors handling the same product. It has never happened unless a picture is in public domain. Naturally, this [Radio Picture Show] is not."

He continued to testify that an exclusive contract "[is] protection for the distributor and it's also protection for the producer."

Horn, Radio's witness, who had an exclusive contract with Radio for the entire United States, testified that over the years he sold 75% exclusive, and 25% non-exclusive. He preferred an exclusive territory because "if you are in the market place and you are the only man they can deal with, you're much ahead."

In *House v. Lesow*, (1975) 167 Ind.App. 449, 339 N.E.2d 86, we stated the general

principles concerning construction of contracts:

"The cardinal principle of contract interpretation is to ascertain the intention of the parties from their expression of it and to give affect to that intention if it can be done consistently with legal principles. *Fort Wayne Bank Bldg., Inc. v. Bank Bldg. & Equip. Corp.* (1974), [160] Ind.App. [26], 309 N.E.2d 464.

Although evidence of intent of the parties which is extrinsic to a contract may properly be considered by a court where fraud, mistake, illegality, duress or undue influence are shown, such evidence is not admissible where these are not shown and where the terms of the instrument are susceptible of a clear and unambiguous construction. *Id.* If the meaning of a contract is clear and unambiguous on its face, its effect will not be controlled by an erroneous construction placed on the agreement by the parties. *Id.*

Contracts should neither be so narrowly or technically interpreted as to frustrate their obvious design nor be so loosely interpreted as to relieve the obligor from a liability fairly within the scope or spirit of their terms. *Pierce v. Yochum* (1975), [164] Ind.App. [443], 330 N.E.2d 102.

In construing a contract, the court cannot extract particular clauses, but must read the contract as a whole, giving effect to each provision if possible. *Meyers v. Maris* (1975), [164] Ind.App. [34], 326 N.E.2d 577. In the absence of an ambiguity, the construction of a written contract is a question of law to be resolved by the court. *Id.* The test used to determine if a written contract is ambiguous is whether reasonable men would find the contract subject to more than one construction. *Id.*

*House,* 339 N.E.2d at 90.

■ Also when a contract is ambiguous, custom and usage may be used to ascertain the otherwise uncertain meanings of a contract. *Wright Manufacturing Corp. v. Scott,* (1977) 172 Ind.App. 154, 360 N.E.2d 2; 9 I.L.E. *Customs and Usage,* Sec. 7 (1971).

In *Wright* we said:

"In the case of *Morningstar v. Cunningham* (1887), 110 Ind. 328, 11 N.E. 593, 596, our Supreme Court stated the rule as follows:

'... Where a usage in a particular trade or business is *known,* uniform, reasonable, and not contrary to law, or opposed to public policy, evidence of such usage may be considered in ascertaining the otherwise uncertain meaning of a contract, unless the proof of such usage contradicts the express terms of the agreement. This is so, even though the usage be that of a particular person, provided it be known to the parties concerned, or provided it has been so long continued, or has become so generally known and notorious in the place or neighborhood, as to justify the presumption that it must have been known to the parties.... Parties who are engaged in a particular trade or business, or persons accustomed to deal with those engaged in a particular business, may be presumed to have knowledge of the *uniform course of such business.* Its usages may therefore, in the absence of an agreement to the contrary, reasonably be supposed to have entered into and formed part of their contracts and understandings in relation to such business, as ordinary incidents thereto....' (Our emphasis) (Citations omitted)."

*Wright,* 360 N.E.2d at 9.

*See also Clark Advertising Agency v. Avco Broadcasting Corp.,* (1978) 178 Ind. App. 451, 383 N.E.2d 353.

In analyzing the contract we note that the term exclusive was never used. In paragraph one, Exclusive was appointed "*a*" representative in the designated territory. Yet in paragraph two the contract refers to "your territory." Paragraph three again refers to "your territory." Paragraph six states:

"For services rendered under this Agreement the *Company* shall pay *you* Twenty-Five (25) \*\*\*\*\*\*\*\*\* % commission on *its* Net Sales within stated territory.

For purposes hereof the term "Net Sales shall mean the total gross sales less discounts, all allowances and credits granted." (Emphasis added).

■ The reference to "your" territory, and the agreement to pay Exclusive twenty-five percent of "its" net sales within the territory conjure up the image that the contract is exclusive. "Its" can only refer to Radio, and the term "your" is applied to Exclusive. Should the term "a representative" create an ambiguity, the court could, in construing the contract, rely on all matters surrounding the negotiations and execution of the contract, and matters occurring thereafter, including custom and usage in the trade. The added weight of the territory of Stewart and Horn confirms the conclusion reached by the trial court that the contract was exclusive. Examination of the record discloses that this issue does not seem to have occurred to Radio prior or during trial, but was an afterthought, and was first advanced in the motion to correct errors. We are reminded of a quote by Cardozo, J. in *Wood v. Lucy, Lady Duff-Gordon,* (1917) 222 N.Y. 88, 118 N.E. 214, *reargument denied,* 118 N.E. 1082 (1918):

"A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed."

■ As a part of this agreement Radio argues that the contract is unenforceable for lack of mutuality. We have examined the pleadings, evidence and the motion to correct errors and its accompanying memorandum, and such an issue was not raised, or argued at the trial level. Therefore, this issue is waived. As stated in *Contech Architects and Engineers v. Courshon,* (1979) 180 Ind.App. 77, 387 N.E.2d 464, 467–78.

"Consequently, the law does not permit Contech now to writing this entirely new argument from its motion to correct errors. An alleged error should be first specifically presented to the trial court for an opportunity for correction and should not be hidden in a generality to be later specifically raised on appeal." (Citations omitted).

Accordingly, we decline to write on this issue.

Issue VI. *Judgment Against 3622 Limited.*

Finally appellants argue that their evidence is not sufficient to support a judgment against 3622 Limited. 3622 Limited, after having been made a party, and after having been served summons, appeared and filed its answer (1) in denial; and (2) challenging jurisdiction. No issue was raised and no evidence was presented by which 3622 Limited was immune from judgment because of its limited partnership status. However, such argument is now presented.

We first note that though these various corporations and partnerships were created under the laws of states other than Indiana, there was no effort on the part of Radio to present the various legal requirements, agreements, documents, evidence of filing, or compliance in those states, if indeed compliance existed. No argument is made concerning knotty problems of what law would govern. Instead, Radio cites to certain sections of the Uniform Limited Partnership Act as it exists in Indiana.

■ IND.CODE 23–4–2–26 provides that a limited partnership is not a proper party in a proceeding against the partnership, and IND.CODE 23–4–2–7 states that "[a] limited partner shall not become liable as a general partner *unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.*" (Emphasis added). IND.CODE 23–4–2–1 states that a limited partner is not bound by partnership debts. However, in order to obtain the benefits of a limited partnership in those states where the Uniform Limited Partnership Act has been adopted, a partnership must comply with the registration requirements of the

Act. *Plaza Realty Investors v. Bailey,* (S.D.N.Y.1979) 484 F.Supp. 335.

▅ Contrary to the argument made by Radio, the limitation on liability in favor of a limited or special partner is a matter of defense so that it is not necessary for one suing a partnership to allege and prove its general or limited character. 68 C.J.S. *Partnerships,* Sec. 486, at 1038 (1950); *Howard v. Gray's Warehouses,* (1932) 242 Ky. 501, 46 S.W.2d 787; *Henkel v. Heyman,* (1878) 91 Ill. 96. Burden of proof follows the burden of pleading. T.R. 8(C).

▅ Exclusive filed suit against the various entities without alleging the partnership status. However, based on discovery elicited from John Brown, answers in requests for admissions as to the status of the entities was read into evidence. The bare characterization of 3622 Limited by John Brown as a limited partnership is the only evidence of its status. There was no evidence of compliance under Texas law, or even the terms of limitation. The court is left to guess. 3622 Limited has not carried its burden of pleading and proving its immunity.

Additionally the evidence set forth in detail in the statement of facts discloses that John Brown, president of 3622 Limited, Encore, and Tuffy, who made no claim to act as an officer, director, employee, or agent of Roxxon or Radio, not only took part in the contract of Radio, he dominated it. Since he made no claim to a status other than being president of 3622 Limited, Encore and Tuffy, it is permissible to assume that he acted in behalf of his companies. Under these circumstances, IND.CODE 23–4–2–26 prevents that claim for immunity. We find no error.

For the reasons stated above, this cause is affirmed.

Judgment affirmed.

RATLIFF, P.J., concurs.

ROBERTSON, J., concurs in part, dissents in part with separate opinion.

ROBERTSON, Judge, concurring in part, dissenting in part.

I respectfully dissent to the majority's resolution of the second issue for the reason that the general partner of Radio Picture was not served with process in compliance with T.R. 4.6.

I concur in all other respects.