CHICAGO SOUTHSHORE & SOUTH BEND RAILROAD, A General Partnership, Appellant–Plaintiff–Counter–Defendant,

v.

ITEL RAIL CORPORATION, A Corporation, Appellee–Defendant–Counterclaimant.

No. 45A05–9311–CV–412.

Court of Appeals of Indiana.

Dec. 7, 1995.

---

Stanley C. Fickle, Alan K. Mills, Barnes & Thornburg, Indianapolis, for appellant.

Kenneth D. Reed, Abrahamson Reed & Adley, Hammond, Daniel L. Freeland, Komyatte & Freeland, Highland, David S. Curry, Mayer Brown & Platt, Chicago, Illinois, for appellee.

## OPINION

SHARPNACK, Chief Judge.

Chicago SouthShore & South Bend Railroad ("CSSB") appeals from the trial court's grant of summary judgment in favor of the defendant-appellee, Itel Rail Corporation ("Itel") on both CSSB's complaint and Itel's counterclaim. Appellant raises three issues for review which we restate as follows:

1. whether the trial court erred in granting summary judgment in favor of Itel's counterclaim;

2. whether the trial court erred in granting summary judgment in favor of Itel on CSSB's complaint; and

3. whether the trial court properly awarded attorney's fees and expenses to Itel.

We affirm.

### Facts

On December 27, 1988, Itel executed a lease agreement with Chicago South Shore and South Bend Railroad ("Bankrupt Railroad").[1] The Bankrupt Railroad operated a common carrier freight which used a type of railroad car known as a "gondola" car. Pursuant to the lease agreement, Itel contracted to lease gondola cars to the Bankrupt Railroad. The lease agreement included a master lease and attached schedules to the master lease.

The master lease provided the general terms of the agreement, including the maintenance costs on the leased gondola cars. The schedules to the master lease contained specific information concerning the gondola cars. This dispute only concerns Schedule No. 1.

Schedule No. 1 provided that Itel would lease fifty gondola cars to the Bankrupt Railroad for $350 a month. While the Bankrupt Railroad was responsible for maintaining the cars, Itel was required to reimburse the Bankrupt Railroad for maintenance costs. The schedule prescribed the reimbursement procedure as follows:

"Lessee [Bankrupt Railroad] shall submit to Lessor [Itel] a monthly report in complete AAR [Association of American Railroads] format for all sums due to Lessee from Lessor for such calendar month with respect to the maintenance of the Cars, including sums due for maintenance performed by third parties and for maintenance performed by Lessee. Lessor shall pay to Lessee all sums due pursuant to this Subsection within thirty (30) days after receipt of such monthly maintenance report and bill."

Record, pp. 302–3.

On April 7, 1989, three months after executing the lease agreement, the Bankrupt Railroad filed a petition for relief in the United States Bankruptcy Court for the Northern District of Illinois. The court appointed a trustee for the Bankrupt Railroad. After auditing its finances, the Bankrupt Railroad discovered it owed a substantial debt to Itel for the leased gondola cars. On May 26, 1989, the Bankrupt Railroad prepared schedules which showed an unsecured debt owed to Itel in the amount of $119,175.87.

On July 21, 1989, the trustee notified the Bankrupt Railroad's creditors, including Itel, that they must file proofs of claim before September 29, 1989.[2] In response, Itel filed a proof of claim before the deadline. However, Itel asserted that the Bankrupt Railroad was only indebted to Itel for $334.77. Itel's proof of claim stated that the consideration for the debt was "unpaid rentals earned pursuant to a Lease Agreement dated December 27, 1988." Record, p. 486 Itel also attached a copy of the lease agreement to the proof of claim as evidence of the debt. However, Itel did not intend its proof of claim to cover the $119,175.87 debt listed in the Bankrupt Railroad's schedules. Itel intended its proof of claim to cover another debt for rental due to Itel. The Bankrupt Railroad had subleased several of the leased gondola cars to third party carriers incurring a $344.77 debt.

On September 22, 1989, the controller of the Bankrupt Railroad informed Itel that Arthur Andersen & Co. was auditing the Bankrupt Railroad's financial statements. The controller requested that Itel advise Arthur Andersen "whether or not there is a

1. To minimize confusion, we refer to Chicago South Shore & South Bend Railroad as the "Bankrupt Railroad," because it filed for bankruptcy soon after executing this lease agreement. The Bankrupt Railroad is not the same company as the appellant. We note the sole difference between the names of these companies is slight; the appellant uses "SouthShore" and the Bankrupt Railroad uses "South Shore." The primary relationship between the Bankrupt Railroad and the appellant is that the appellant's predecessor

in interest purchased some of the Bankrupt Railroad's assets during a bankruptcy proceeding.

2. A proof of claim is a written statement setting forth a creditor's claim. Fed.R.Bankr.P. 3001(a). A creditor must file the proof of claim with the bankruptcy court before the deadline or else be forever barred from raising that claim. *See In re Candy Braz, Inc.*, 98 B.R. 375 (Bankr. N.D.Ill.1988).

balance due you by this company as of August 31, 1989." Record, p. 534. On October 10, 1989, Itel responded that the Bankrupt Railroad owed Itel the amount of $144,538.87, representing rentals due on the gondola cars. However, Itel failed to inform the bankruptcy court that the Bankrupt Railroad owed Itel $144,538.87, rather than the $344.77 amount that Itel claimed.

On November 16, 1989, the trustee submitted his First Amended Plan of Reorganization ("reorganization plan") to the bankruptcy court for confirmation. Under the reorganization plan, the trustee sold the Bankrupt Railroad's assets to various other railroads. Southshore Acquisition Company ("SAC"), the predecessor in interest to CSSB, purchased the Bankrupt Railroad's freight business and assets. According to the reorganization plan, SAC agreed to assume certain liabilities of the Bankrupt Railroad, including the Bankrupt Railroad's debt to Itel.

On December 11, 1989, the bankruptcy court entered an order confirming the reorganization plan whereby SAC acquired the Bankrupt Railroad's freight line. On December 31, 1989, SAC's interests in the freight line were transferred to a newly formed company, CSSB. When CSSB assumed the Bankrupt Railroad's freight line from SAC, CSSB also assumed the Bankrupt Railroad's debt to Itel. Although the actual debt was in the amount of $119,175.87, Itel's proof of claim listed the debt as only $334.77. On January 17, 1990, CSSB paid Itel $344.77 in satisfaction of Itel's proof of claim. However, at this time, Itel did not inform CSSB that CSSB had failed to satisfy the entire debt.

After the Bankrupt Railroad's assets were transferred in the bankruptcy proceeding, CSSB replaced the Bankrupt Railroad as lessee under the lease agreement, and Itel remained the lessor. Pursuant to the lease agreement, CSSB paid the rent on leased gondola cars, but failed to bill Itel for maintenance costs. On June 1, 1991, CSSB notified Itel that CSSB planned to cancel the lease agreement which was due to expire within two months. CSSB then audited its account and discovered that it had never billed Itel for maintenance costs. According

to Schedule No. 1 of the master lease, Itel was responsible for reimbursing the lessee for maintenance costs on the gondola cars. Although the lease agreement stated that the lessee must bill Itel on a monthly basis, CSSB sent Itel an invoice for $138,516.48 for maintenance costs on the gondola cars which covered the entire term of the lease agreement.

On October 17, 1991, Itel responded to CSSB's demand by sending CSSB a check for $32,612.75, stating that:

> "Under the provision of AAR Rules of Interchange and as outlined in the Field and Office Manuals, any charges for repairs performed beyond the one year time frame from the date received by Itel have been denied. Those changes falling within the time limitations have been audited according to the AAR Rules."

Record, p. 932. CSSB protested and claimed the AAR time restriction did not apply to this situation. CSSB also withheld rental payments, totaling $13,536.92, due on the gondola cars for the months of July, August, and September of 1991.

After further exchanges, CSSB filed a complaint on May 11, 1992. CSSB claimed Itel was obligated to reimburse CSSB for all maintenance costs on the gondola cars. Itel's answer denied that it owed CSSB for the unpaid balance of maintenance costs because CSSB had failed to timely submit invoices for those amounts as required by the AAR and the lease agreement. Itel also claimed the CSSB's complaint was set off by the amount of $13,536.92 which CSSB owed Itel for three months rent on the fifty gondola cars. Itel further claimed the complaint was set off by the amount of $123,497.00 for rents due under the lease agreement prior to CSSB's acquisition of the gondola cars.

Itel also filed a counterclaim which sought to recover the same rents alleged as setoffs in its answer. CSSB admitted in its reply that it owed Itel $13,536.92 representing three months rent on the gondola cars. However, CSSB denied that it was obligated for prior rents due under the lease agreement. CSSB argued that its obligation to

Itel was barred because Itel failed to raise the claim during the bankruptcy proceeding.

After discovery, the parties filed cross-motions for summary judgment on both the complaint and the counterclaim. On May 26, 1993, the trial court held a hearing on the motions for summary judgment. On July 26, 1993, the trial court granted summary judgment in the favor of Itel on both CSSB's complaint and Itel's counterclaim. The trial court awarded Itel $13,536.92 plus interest for three months rent on the gondola cars and $123,403.85 plus interest for rent owed prior to CSSB's acquisition of the gondola cars. On October 22, 1993, the trial court awarded Itel $17,044.67 in attorney's fees and $842.70 in expenses. CSSB now appeals the trial court's judgment.

### Discussion

When we review a trial court's entry of summary judgment, we are bound by the same standard as the trial court. *Ayres v. Indian Heights Volunteer Fire Dept., Inc.* (1986), Ind., 493 N.E.2d 1229, 1234. We may consider only those portions of the pleadings, depositions, answers of interrogatories, admissions, matters of judicial notice, and any other matters designated to the trial court by the moving party for purposes of the motion for summary judgment. *Rosi v. Business Furniture Corp.* (1993), Ind., 615 N.E.2d 431, 434; Ind.Trial Rule 56(C), (H). We may not reverse a granting of summary judgment on the grounds that there is a genuine issue of material fact unless the material fact and relevant evidence were specifically designated to the court. *Rosi*, 615 N.E.2d at 434. "The appellant bears the burden of proving that the trial court erred in determining that there are no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law." *Id.* Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.* (1991), Ind., 575 N.E.2d 630, 633. "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of

supporting conflicting inferences on such an issue." *Scott v. Bodor, Inc.* (1991), Ind.App., 571 N.E.2d 313, 318.

■ In the present case, the fact that both parties requested summary judgment does not alter our standard of review. *Laudig v. Marion County Board of Voters Registration*, (1992), Ind.App., 585 N.E.2d 700, 704, *trans. denied.* Rather, "we must separately consider each motion to determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Id.*

■ In the present case, the trial court issued findings of fact and conclusions thereon. While Ind.Trial Rule 56 does not require the trial court to issue findings of fact and conclusions thereon in a summary judgment, the rule does not prohibit the trial court from doing so. *P.M.S., Inc. v. Jakubowski* (1992), Ind.App., 585 N.E.2d 1380, 1382 n. 1. We will affirm the granting of summary judgment on any legal basis supported by the record. *Id.* Our standard of review is unchanged by the entry of findings of fact and conclusions thereon. *Id.* In the summary judgment context, the entry of findings of fact and conclusions thereon aids our review by providing us with a statement of the reasons for the trial court's actions, but it has no other effect. *Id.*

### I.

The first issue we address is whether the trial court erred in granting summary judgment in favor of Itel's counterclaim. The trial court awarded Itel $123,403.85 plus interest for rental charges incurred by the Bankrupt Railroad under the lease agreement. The trial court stated two separate conclusions to support its judgment, and CSSB challenges both of these conclusions. We hold the trial court's first conclusion supports the granting of summary judgment, and, therefore, we need not address the trial court's alternative reason for its judgment.

■ First, CSSB contends that Itel's proof of claim superseded the Bankrupt Railroad's scheduled debt. Essentially, CSSB argues that because Itel filed a proof of claim for $334.77 with the bankruptcy court, Itel is

now barred from collecting the actual debt of $119,175.87. CSSB relies on Federal Bankruptcy Rule 3003(c)(4) which provides:

"A proof of claim or interest executed and filed in accordance with this subdivision shall supersede any scheduling of that claim or interest pursuant to § 521(1) of the Code."

Fed.R.Bankr.P. 3003(c)(4). CSSB contends that the plain language of Rule 3003(c)(4) requires that Itel's proof of claim supersede the Bankrupt Railroad's scheduled debt.

However, the trial court concluded that Itel's proof of claim for $334.77 was intended to cover another debt owed to Itel, rather than a claim for the Bankrupt Railroad's entire debt under the lease agreement. Therefore, Itel's proof of claim did not supersede the Bankrupt Railroad's scheduled debt. In its conclusions of law, the trial court stated:

"(13) That a Proof of claim intended as a separate and distinct request for payment does not supersede nor amend a different claim listed in the Debtor's schedules pursuant to Bankruptcy Rule 3003(c)(4), rather, the Proof of Claim represents a new claim allowable as such, if filed in accordance with Bankruptcy Rule 3003(c)(2) dealing with the filing of claims."

Record, p. 1102. We hold the trial court properly determined that Itel's claim did not supersede the scheduled claim as a matter of law.

■ At the outset, we note that Itel was not required to file a proof of claim with the bankruptcy court because the Bankrupt Railroad listed the $119,175.87 debt in its schedules. Rule 3003(b)(1) provides, "the schedule of liabilities filed ... shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated." Fed.R.Bankr.P. 3003(b)(1).

■ CSSB contends that the plain language of Rule 3003(c)(4) supports its argument that Itel's proof of claim superseded the Bankrupt Railroad's scheduled debt. However, case law exists which recognizes that new claims may be filed in addition to the original proof of claim. *See In re Candy*

*Braz, Inc.,* 98 B.R. 375 (Bankr.N.D.Ill.1988). A proof of claim for a new, unscheduled claim is not within the scope of Rule 3003(c)(4).

The trial court relied on *In re Candy Braz, Inc.,* 98 B.R. at 375, which involved a creditor who filed a proof of claim for additional taxes after the bar date. The trustee of the debtor objected on the grounds that the proof of claim was filed too late. *Id.* at 378. Subsequently, the creditor filed an amended proof of claim that substantially increased the amount of the debt. *Id.*

■ The *Candy Braz* court held that Rule 3003(c) is not a statute of limitations which would leave the court without discretion to allow late filed claims. *Id.* at 380. The court also held that an amendment may be filed after the bar date if the party amends a timely claim and does not introduce a distinctly new and different claim. *Id.* Amendments to claims are closely scrutinized to ensure that the amendment is genuine rather than an assertion of a new claim. *Id.* The court applies the principles of equity which provide that "fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Id.* at 381 (citing *Pepper v. Litton* (1939), 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281). The *Candy Braz* court held that the creditor's amended claim involved the same type of unpaid tax for the same fiscal period and, therefore, was not a new claim.

We now turn our focus to whether Itel's proof of claim for $344.77 was distinctly new and different from the scheduled debt for $119,175.87. A similar issue was decided in *In re AM International, Inc.,* 67 B.R. 79 (N.D.Ill.1986). The issue before the *AM International* court was whether a claim filed after the bar date should be characterized as an amendment to the original claim or an entirely new claim. *Id.* at 80. The creditor filed a proof of claim for $51,743.07 before the bar date. *Id.* at 81. After the bar date, the creditor discovered the debtor owed him an additional $131,413.47, so the creditor filed another proof of claim for that amount. *Id.* The parties disagreed as to whether the second proof of claim was an amendment to the

original claim or a new claim. *Id.* If the second claim was a new claim, then it would have been barred for being untimely.

The trial court found that the two claims involved the same type of tax. *Id.* at 82. However, the first claim concerned taxes already collected by the creditor from its customers, and the second claim concerned uncollected taxes. *Id.* The second claim also covered a different time period than the first claim. The *AM International* court found the differences between the two tax claims were significant enough to support a conclusion that the second claim was not an amendment but the assertion of a new claim. *Id.* The *AM International* court agreed with the trial court's conclusion that:

> "[M]erely because the taxes involved are of the same general type does not, in and of itself, support a finding that the second claim is an amendment to the first claim. Ordinarily, to be within the scope of a permissible amendment, the second claim should not only be of the *same nature* as the first but also *reasonably within the amount* to which the first claim provided notice."

*Id.* at 82 (emphasis added).

Applying the analysis of *In re AM International, Inc.*, we hold that Itel's proof of claim for $344.77 represented a new claim for extra charges, rather than satisfaction of the Bankrupt Railroad's $119,175.87 scheduled debt under the lease agreement. First, we find that Itel's proof of claim is not "reasonably within the amount" owed under the Bankrupt Railroad's scheduled debt. *See id.* Itel's proof of claim is approximately 356 times less than the amount listed on the Bankrupt Railroad's scheduled debt.

Second, we find that the Itel's proof of claim was for a debt of a different nature than the debt owed under the lease agreement. Itel submitted a document to the trial court which showed that Itel's proof of claim represented another debt for rentals due to Itel. The Bankrupt Railroad subleased several of the leased gondola cars to third party carriers incurring a $344.77 debt. Although Itel's proof of claim concerns the same gondola cars covered by the lease agreement, the sublease of those cars is a separate trans-

action from the lease agreement. Moreover, Itel's proof of claim for sublet rentals covers a different time period than the monthly rentals under the lease agreement.

Although the express language of Itel's proof of claim states that the Bankrupt Railroad owes Itel $344.77 under the lease agreement, we do not find that is dispositive of this issue. We find Itel's proof of claim is of a different nature and substantially less than the Bankrupt Railroad's scheduled debt. Therefore, Itel's claim was a separate and distinct request for payment. Because Itel was not required to file a proof of claim for the Bankrupt Railroad's previously scheduled debt of $119,175.57, and because Itel's proof of claim for the sublet gondola cars represented a new claim with no scheduled claim to supersede, the trial court properly determined that Itel's claim did not supersede the scheduled claim as a matter of law.

■ In the alternative, CSSB argues that the trial court had no jurisdiction over Itel's counterclaim. CSSB argues that federal bankruptcy courts have exclusive jurisdiction over core proceedings which include administrative claims and assumptions of executory contracts. Because Itel failed to present its administrative claim to the bankruptcy court, CSSB contends that the trial court had no jurisdiction.

In its conclusions of law, the trial court set forth its jurisdictional basis:

> "(12) That jurisdiction is proper in this Court because 28 U.S.C. § 1471(e) does not confer the Bankruptcy Court with exclusive jurisdiction over post-confirmation lease disputes involving the Debtor; rather, the jurisdiction is concurrent with that of State Courts."

Record, p. 1101.

CSSB points out that 28 U.S.C. § 1471 was repealed in 1984. However, § 1471 was replaced by 28 United States Code § 1334 which retained the same language as its predecessor. Section 1334 provides in part:

> "(a) Except as provided in subsection (b) of this section, the district courts have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

28 U.S.C. § 1334(a), (b) (1995).

 The grant of original, but not exclusive, jurisdiction to the district courts does not deprive other state and federal courts of jurisdiction over such civil proceedings. *In re Weinberg,* 153 B.R. 286, 290 (Bankr.D.S.D.1993). The district courts and their bankruptcy units have exclusive jurisdiction only over the bankruptcy petition itself; in other matters arising from Title 11 actions, state courts have concurrent jurisdiction. *Matter of Brady,* (5th Cir.1991), 936 F.2d 212, 218, *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 748 (1991). Therefore, we hold that the trial court had jurisdiction over Itel's counterclaim.

## II.

 The second issue we address is whether the trial court erred in granting summary judgment in favor of Itel on CSSB's complaint. In its complaint, CSSB sought to recover unpaid maintenance expenses incurred on the leased gondola cars. Under the terms of the lease agreement, Itel, as lessor, was responsible for reimbursing the lessee for maintenance costs on those cars. Although the lease agreement stated that the lessee must bill Itel on a monthly basis, CSSB demanded Itel pay $138,516.48 for maintenance expenses covering the entire thirty-five month term of the lease agreement.

CSSB argues that Itel failed to submit enough evidence to the trial court to establish that Itel was entitled to judgment as a matter of law. We disagree.

When we review a trial court's entry of summary judgment, we may consider only those portions of the pleadings, depositions, answers or interrogatories, admissions, matters of judicial notice, and any other matters designated to the trial court. *Rosi v. Business Furniture Corp.* (1993), Ind., 615

N.E.2d 431, 434. We may not reverse a granting of summary judgment on the grounds that there is a genuine issue of material fact unless the material fact and relevant evidence were specifically designated to the court. *Id.*

In the present case, the express language of the lease agreement is dispositive of this issue. Schedule No. 1 to the master lease described the procedure for reimbursement in paragraph 5(B):

"Lessee shall submit to Lessor a monthly report in complete AAR format for all sums due to Lessee from Lessor for such calendar month with respect to the maintenance of the Cars, including sums due for maintenance performed by third parties and for maintenance performed by Lessee. Lessor shall pay to Lessee all sums due pursuant to this Subsection within thirty (30) days after receipt of such monthly maintenance report and bill."

Record, pp. 302–3.

The trial court relied on the plain language of paragraph 5(B) when rendering its decision. In its conclusions thereon, the trial court stated:

"(4) CSSB failed to perform and breached the parties' lease agreement, in contravention of the express terms thereof, and in contravention of the AAR Rules, by wholly failing to submit to Itel a monthly report in complete AAR format for all sums due to CSSB from Itel for such calendar month with respect to the maintenance of the cars, including sums due for maintenance performed by third parties and for maintenance performed by Lessee.

(5) ... In substance, Itel was effectively deprived of the opportunity to seasonably contest the repair bills as to the need for the repairs, the responsibility for the damage necessitating the repairs, or the amount charged for the repairs. As can be seen in document 8, the repair bills were not submitted in AAR format, and were replete with inaccuracies detected by Itel, but beyond time for contesting same."

Record, p. 1099.

CSSB argues, contrary to the trial court's conclusion, the language in paragraph 5(B) is

ambiguous. CSSB contends paragraph 5(B) can be construed to permit the railroad to accumulate its billing for the entire term of the lease, thirty-five months, and then tender a compiled list of repairs to Itel.

When interpreting a written contract, we determine the intent of the parties at the time of execution as revealed by the language they chose in expressing their rights and responsibilities. *Donnelley & Sons, Co. v. Henry–Williams, Inc.* (1981), Ind.App., 422 N.E.2d 353, 356. Contracts should not be so narrowly interpreted as to frustrate their obvious design or so loosely interpreted as to relieve a party of a liability fairly within the scope of the contract's terms. *Radio Picture Show Partnership v. Exclusive International Pictures, Inc.* (1985), Ind.App., 482 N.E.2d 1159, 1167, *reh'g denied, trans. denied* (citing *House v. Lesow* (1975), 167 Ind.App. 449, 454, 339 N.E.2d 86, 90).

Where the terms of a contract are clear, the meaning of the contract is determined as a matter of law. *Piskorowski v. Shell Oil Co.* (1980), Ind.App., 403 N.E.2d 838, 844. Where a contract is ambiguous, however, and its meaning cannot be gleaned from the four corners of the instrument, the intention of the parties is a question of fact and reliance upon extrinsic evidence is proper. *English Coal Co., Inc. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302, 308–09, *reh'g denied, trans. denied.* A contract is ambiguous if reasonable people would find the contract subject to more than one interpretation. *Radio Picture Show Partnership,* 482 N.E.2d at 1167.

Upon our review of paragraph 5(B) of Schedule No. 1 and the lease agreement as a whole, we conclude that the contract is subject to only one possible interpretation and is, therefore, unambiguous. *See Anderson v. Horizon Homes, Inc.* (1995), Ind.App., 644 N.E.2d 1281, 1290, *trans. denied.* Paragraph 5(B) requires the lessee to submit to Itel monthly reports in AAR format.

As found by the trial court, the lease agreement bound the lessee and the lessor to the AAR rules. Paragraph 3(A) of the master lease provides, "Lessee covenants that it shall subscribe to the Association of American Railroads interchange rules adopted by the AAR Mechanical Division, Operations and Maintenance Department for the duration of this Agreement." Record, p. 288. In numerous other provisions of the lease agreement, the parties agreed to the applicability of the AAR rules.

According to the AAR rules, repair bills must be submitted within twelve months after the date of repairs or be forfeited. The purpose for this time limit is to give the railroad which is responsible for paying the repair bills an opportunity to challenge these bills within a reasonable time frame.

CSSB sent Itel an invoice for $138,516.48 for maintenance costs on the gondola cars which covered the entire term of the lease, thirty-five months. Itel refused to pay any repair bills that were over a year old. Instead, Itel paid $32,612.75 representing the maintenance costs that were less than one year old.

Contrary to CSSB's contentions, there is no provision in the lease agreement which would allow the lessee to delay payments until the end of the lease agreement. CSSB fails to provide any evidence that the parties agreed to an alternative payment scheme.

CSSB, as the lessee, completely failed to follow the procedure set out in paragraph 5(B). It is undisputed that CSSB waited until the lease had nearly expired, before it submitted a repair bill to Itel for the entire term of the lease agreement. Sufficient evidence exists to determine that CSSB's complaint to recover unpaid maintenance expenses had no genuine issues of material fact. *See Rosi,* 615 N.E.2d at 434. Therefore, the trial court did not err in granting summary judgment in favor of Itel.

### III.

The third issue we address is whether the trial court properly awarded attorney's fees and expenses to Itel. After an evidentiary hearing, the trial court awarded Itel $17,044.67 for attorney's fees and $842.70 for expenses.

Generally, each party to a litigation must pay his own attorney's fees. *Hol-*

*land v. Miami Systems, Inc.* (1993), Ind. App., 624 N.E.2d 478, 481, *trans. denied.* A trial judge may order one party to pay the attorney's fees of an adversary if authorized by statute or contractual terms. *Id.* Where a contract authorizes attorney's fees, the award is limited to those expressly provided for in the contract. *See generally Bohlin v. Jungbauer* (1993), Ind.App., 615 N.E.2d 438, 441.

■ What constitutes reasonable attorney's fees is a matter largely within the trial court's discretion. *Canaday v. Canaday* (1984), Ind.App., 467 N.E.2d 783, 785. "[S]ince the judge is considered an expert, our decisions continue to adhere to the view that he may judicially know what constitutes a reasonable fee." *Id.*

In the present case, the trial court determined that under the terms of the lease agreement, Itel was entitled to recover reasonable attorney's fees and expenses. Paragraph 11(B) of the master lease states:

"Upon the occurrence of any right of default hereunder, without limiting Lessor's rights and remedies otherwise provided by law which shall be available to Lessor in addition to the following rights and remedies (no right or remedy of Lessor being exclusive but all such rights and remedies being available at all times to Lessor, and Lessor, in any case, being *entitled to recover all costs, expenses and attorney's fees incurred by Lessor in enforcing its rights and remedies* hereunder) . . . ."

Record, p. 296 (emphasis added).

CSSB does not contest the reasonableness of the attorney's fees. Rather, CSSB argues that paragraph 11(B) limits Itel to attorney's fees incurred in enforcing its rights and remedies for the lessee's default. In effect, CSSB construes paragraph 11(B) to prevent Itel from recovering attorney's fees incurred in defending claims by the lessee when Itel has defaulted. CSSB concludes that Itel should not receive attorney's fees in association with its defense against CSSB's complaint for unpaid rent on the gondola cars. We disagree.

Under the express terms of the lease agreement, we find that the Bankrupt Rail-road defaulted. Paragraph 11(A) of the lease agreement lists five ways in which the Bankrupt Railroad could default:

"The occurrence of any of the following events shall be an event of default:

(i) The nonpayment by Lessee of any sum required herein to be paid by Lessee within thirty (30) days after the date any such payment is due;

(ii) The breach by Lessee of any other term, covenant, or condition of this Agreement, which is not cured within thirty (30) days thereafter;

(iii) The filing by or against Lessee of any petition or the initiation by or against Lessee of any proceeding: a) for any relief which includes, or might result in, any modification of the obligations of Lessee hereunder; or b) under any bankruptcy, reorganization, receivership, insolvency, moratorium or other laws relating to the relief of debtors, the readjustment of indebtedness, financial reorganization, arrangements with creditors, compositions of or extensions of indebtedness;

(iv) The subjection of any of the Lessee's property to any levy, seizure, assignments, application or sale for or by any creditor or governmental agency the effect of which would be to impair Lessee's ability to perform its obligations hereunder;

(v) Any action by Lessee to discontinue rail services on all or a substantial portion of its track or to abandon any of its rail properties that would affect Lessee's ability to perform its obligations."

Record, pp. 295–96.

When the Bankrupt Railroad failed to pay rentals for its gondola cars and filed for bankruptcy, it perpetrated four of the five acts of default listed in paragraph 11(A); the single exception being subparagraph (iv). Therefore, Itel, as lessor, is entitled to attorney's fees and expenses for enforcing its rights and remedies under the lease agreement. We hold the trial court properly awarded attorney's fees and costs to Itel.

For the forgoing reasons, we affirm the judgment of the trial court in all respects.

AFFIRMED.

BARTEAU and NAJAM, JJ., concur.